**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

FILED

2 15 PM '03

U.S. DISTRICT COURT
NEW HAVEN, CONN.

| | |
|---|---|
| ROBERT A. BURT, OWEN M. FISS, HAROLD HONGJU KOH, KENJI YOSHINO, BRUCE ACKERMAN, ANNE L. ALSTOTT, IAN AYRES, JACK M. BALKIN, YOCHAI BENKLER, RICHARD R.W. BROOKS, AMY L. CHUA, MORRIS L. COHEN, DENNIS E. CURTIS, HARLON L. DALTON, DREW S. DAYS III, BRETT DIGNAM, STEVEN B. DUKE, WILLIAM N. ESKRIDGE, JR., DANIEL C. ESTY, DANIEL J. FREED, ROBERT W. GORDON, MICHAEL J. GRAETZ, OONA A. HATHAWAY, DAN M. KAHAN, PAUL W. KAHN, JAY KATZ, S. BLAIR KAUFFMAN, ALVIN K. KLEVORICK, ANTHONY T. KRONMAN, CARROLL L. LUCHT, DANIEL MARKOVITS, JERRY L. MASHAW, JEAN KOH PETERS, ROBERT C. POST, J.L. POTTENGER, JR., JUDITH RESNIK, CAROL M. ROSE, SUSAN ROSE-ACKERMAN, JED RUBENFELD, VICKI SCHULTZ, REVA SIEGEL, ROBERT A. SOLOMON, STANTON WHEELER, STEPHEN WIZNER, members of the faculty of the Yale Law School, | |
| Plaintiffs, | COMPLAINT |
| | Civil Action No. |
| v. | **303CV01777 JCH** |
| DONALD H. RUMSFELD, in his official capacity as United States Secretary of Defense, | |
| Defendant. | |

## INTRODUCTION

1.      Every year, citizens of the United States who wish to volunteer for service

in the armed forces are denied the opportunity because of a codified policy of

discrimination.  The military deliberately discriminates against gay, lesbian and bisexual

Americans who want to serve their country. The purported justification for this discrimination, that gays in the military would undermine morale, good order, discipline, and unit cohesion, has no factual or moral basis. Empirical studies, including studies by the United States government, have proven that the presence of gay troops presents no threat to morale or unit cohesion. Most of our allies, including the United Kingdom (alongside which the United States recently fought two wars), allow openly gay troops to serve in their militaries with no diminution in morale or cohesion.

2.      It has long been the position of the members of the Yale Law School faculty that anti-gay prejudice, no different from prejudice on the basis of gender, race, or national origin, has no place in any community, including the academic community or the workplace. The members of the faculty have, for many years, expressed this message of tolerance through a formal written policy of non-discrimination, which is taught and implemented in all aspects of Yale Law School (the "Law School") life. The majority of the faculty members believe that discrimination is as unacceptable in the military as it is in civilian employment. That message is expressed by refusing to associate with any employer who discriminates against prospective employees on the basis of race, religion, ethnicity, gender or sexual orientation. Every employer seeking access to Law School-sponsored recruiting services must sign a form certifying that it does not discriminate against its employees. Employers that choose not to sign are not given access to School-sponsored recruiting services. The military would be welcome to recruit at the Law School if it abandoned its discriminatory practices. The military has refused.

3.      Under their policy, the members of the faculty have denied the military the use of the Law School's Career Development Office ("CDO") since 1978 because of the

2

military's refusal to subscribe to the policy's non-discrimination requirements. In 1999, Congress enacted 10 U.S.C. § 983, the current version of the "Solomon Amendment". The statute provides that institutions of higher learning that prohibit or effectively prevent military recruiters from obtaining access to their students may be denied federal funds. In recent years, the Department of Defense ("DOD") increasingly has demanded that military recruiters be given access equal in scope and quality to that afforded employers who subscribe to the Law School's non-discrimination policy.

4.      Since 2002, the military has insisted that it not only be given access to the Law School's students--which the Law School already provided--but that it also be given undifferentiated access to the facilities of the CDO, despite its refusal to comply with the non-discrimination policy. The DOD has asserted that the Law School "sends [a] message" regarding the military that the DOD wants to silence. To coerce the members of the faculty into association with the military's discrimination against gays, and to force their implicit approval of its discriminatory policies--which undifferentiated access to the CDO would convey--the DOD has threatened to deprive Yale University of approximately $300 million of annual federal funding. In order to avoid the loss of that federal funding, since 2002 the faculty members have been forced to acquiesce in a "temporary" suspension of the requirement that the military subscribe to the Law School's non-discrimination pledge if it is to use the facilities of the CDO.

5.      The members of the Law School faculty have a constitutionally protected First Amendment right to disassociate themselves from, and to "send a message" of disapproval of, the military's continuing discrimination against gays and lesbians. By threatening Yale University with a deprivation of $300 million in annual funding unless

3

the members of the faculty acquiesce to its demand for undifferentiated military access to the CDO, the DOD infringes the faculty members' rights of free association and free speech under the First Amendment.  The DOD's attempt to coerce their acquiescence in coerced support of its discriminatory military practices is not justified by any legitimate governmental purpose.

6.      The members of the Law School faculty believe that they cannot carry out their core mission of educating students without providing an academic environment in which each student is treated with equal respect.  Because the military continues to discriminate against gays, violating their rights to privacy and equal protection guaranteed by the Fifth Amendment, the military's coercive demand to use the services of the CDO for active assistance in implementing their discriminatory hiring policy directly overrides the faculty members' capacity to provide a protected, respectful academic environment for their gay and lesbian students.  The military's demand intrudes on the faculty members' special protective relationship with their students and thereby undermines the integrity and autonomy of the academic enterprise, in violation of the due process clause of the Fifth Amendment.

7.      Plaintiffs, who constitute a majority of the current members of the Yale Law School faculty, therefore seek declaratory and injunctive relief protecting their First Amendment rights of Speech and Association and their Fifth Amendment rights to due process of law.

## JURISDICTION AND VENUE

8.      This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the federal Constitution and 28 U.S.C. §§ 1331 and 1361.

9.      The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.

10.     Venue in the District Court for the District of Connecticut is proper pursuant to 28 U.S.C. § 1391(b) and (e).

## PARTIES

11.     The Plaintiffs, each of whom is a member of the faculty of the Yale Law School, are: Robert A. Burt, Owen M. Fiss, Harold Hongju Koh, Kenji Yoshino, Bruce Ackerman, Anne L. Alstott, Ian Ayres, Jack M. Balkin, Yochai Benkler, Richard R.W. Brooks, Amy L. Chua, Morris L. Cohen, Dennis E. Curtis, Harlon L. Dalton, Drew S. Days III, Brett Dignam, Steven B. Duke, William N. Eskridge, Jr., Daniel C. Esty, Daniel J. Freed, Robert W. Gordon, Michael J. Graetz, Oona A. Hathaway, Dan M. Kahan, Paul W. Kahn, Jay Katz, S. Blair Kauffman, Alvin K. Klevorick, Anthony T. Kronman, Carroll L. Lucht, Daniel Markovits, Jerry L. Mashaw, Jean Koh Peters, Robert C. Post, J.L. Pottenger, Jr., Judith Resnik, Carol M. Rose, Susan Rose-Ackerman, Jed Rubenfeld, Vicki Schultz, Reva Siegel, Robert A. Solomon, Stanton Wheeler and Stephen Wizner (collectively the "Faculty Members"). The Yale Law School is located in New Haven, Connecticut. The Faculty Members all reside in or around New Haven, Connecticut, where the events giving rise to this action occurred. The Faculty Members and their colleagues are responsible for creating, administering and enforcing the policies of the Law School, including the Law School's policy on non-discrimination and all policies related to student recruiting by employers at the Law School. Each Faculty Member is a teacher at Yale Law School, responsible for the legal education and the development of their students as members of the legal community. The Faculty Members constitute a majority of the faculty of the Yale Law School.

5

12.     Defendant Donald H. Rumsfeld is the United States Secretary of Defense and is responsible for overseeing the United States Armed Forces and the Department of Defense.  The Secretary is responsible for the formulation and execution of United States defense policy, including all policies governing personnel behavior, recruitment and retention.  Specifically, under 10 U.S.C. § 983 ("Institutions of higher education that prevent ROTC access or military recruiting on campus: denial of grants and contracts from Department of Defense, Department of Education, and certain other departments and agencies") (the "Solomon Amendment"), if Defendant Rumsfeld determines that an institution of higher learning "prohibits, or in effect prevents" military recruiters from gaining entry to the campus or access to students or information about students, the government will withdraw from the institution "[a]ny funds made available for the Department of Defense" and "[a]ny funds made available in a Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act".  10 U.S.C. § 983(b) (d).

**FACTS**

The Law School's Non-Discrimination Policy

13.     The Yale Law School faculty members, who are all law professors, are devoted to the teaching and practice of the law, and also to the teaching and practice of the values central to the law--justice, equal treatment, liberty, and due process.  The members of the Law School faculty place the teaching and practice of those values at the center of their educational mission.

14.     In 1978, as an expression of their commitment to those values, the then members of the faculty (by a majority vote) amended their written non-discrimination policy ("the Policy"), which covers the activities of the Law School, to prohibit

6

discrimination on the basis of sexual orientation.  Since that time, the Policy has

prohibited discrimination on the basis of "age, color, handicap or disability, ethnic or

national origin, race, religion, religious creed, gender (including discrimination in the

form of sexual harassment), marital, parental, or veteran status, sexual orientation, or the

prejudice of clients".  The Law School and the members of the faculty admit students,

grant scholarships, assign housing, grade examinations, recruit and promote faculty

members and hire staff in accordance with the Policy.  Those precepts of non-

discrimination govern all aspects of Law School life, including all activities conducted by

the Law School's teachers and administrators and by any other entity having access to the

Law School's students under the Law School's auspices.

15.     The Policy is an expression of the conviction of the current and former

members of the faculty that a government under law must treat all of its citizens with

equal respect and dignity, whether they are black or white, Jewish or Episcopalian, gay or

heterosexual.  The members of the faculty believe that invidious discrimination on any

basis is morally wrong, and should be legally wrong.  The Policy is a critical means of

communicating that conviction to students, prospective students, prospective faculty

members, prospective employers and the world at large.

16.     Each of the Faculty Members communicates those values of tolerance and

inclusion to their students, both through their teaching and their conduct.  The ability of

the Faculty Members to provide an environment free of discrimination is essential to their

role as academics and educators.  Only in an environment in which all of their students

are equally welcome, treated with equal dignity and equally protected from bigotry, can

the Faculty Members' mission be fulfilled.  The Faculty Members do not allow

employers who discriminate to come into their community and recruit their students, and they refuse to associate with such persons.  Allowing employers who discriminate to recruit students under the Law School's auspices sends a message to the students, the employers and the world at large that the professors of the Yale Law School tolerate invidious discrimination.  They do not.

17.     The Law School has an official recruiting program organized by its Career Development Office ("CDO").  Because the CDO is an official Law School program, and provides employers in the program with the sanction of the members of the faculty, the Policy is clear, and the Faculty Members are adamant, that employers who discriminate not be allowed to participate.  Thus, as part of their message of tolerance, the members of the faculty do not allow prospective employers to participate in Law School-sponsored recruiting programs unless the employers sign a form acknowledging compliance with the Policy, which states:

> "Yale Law School is committed to a policy against discrimination based on age, color, handicap or disability, ethnic or national origin, race, religion, religious creed, gender (including discrimination taking the form of sexual harassment), marital, parental, or veteran status, sexual orientation, or the prejudice of clients.  All employers using the School's placement services are required to abide by this policy."

### The United States Military's Discriminatory Policy

18.     It is the official policy and practice of the United States military to discriminate on the basis of sexual orientation.  Specifically, the statute governing the military's policy toward gays, lesbians and bisexuals provides, in pertinent part, that "[a] member of the armed forces shall be separated from the armed forces" if (1) "the member has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts"; (2) "the member has stated that he or she is a homosexual or bisexual, or

8

words to that effect"; or (3) "the member has married or attempted to marry a person known to be of the same biological sex". 10 U.S.C. § 654 (b)(1)-(3) (1998). In addition, the military subjects members of the armed services who are suspected of engaging in, attempting to engage in, or soliciting others to engage in same-sex sexual conduct to investigations, disciplinary actions, courts-martial, discharge and other forms of harassment.

19.     The military's justifications for its discriminatory policies and practices are without any moral or factual basis. For many years the military tried to justify its anti-gay policy by asserting that homosexuality was a form of mental illness incompatible with military service. See, e.g., Army Reg. 635.89, Sec. I, ¶ 2.a (1966) ("Homosexuality is a manifestation of a severe personality defect which appreciably limits the ability of such individuals to function effectively in a military environment.").

20.     Now--in the wake of overwhelming scientific evidence and expert opinion showing the military's traditional justification for its discriminatory practices to be baseless--the military has invented a new rationale. The current policy states that "[t]he presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability". 10 U.S.C. § 654(a)(15). That justification is unsupported by any evidence. In fact, numerous studies commissioned by the United States government have concluded that gays and lesbians can serve in the military without any detrimental consequences.

21.     The armed forces of many other nations, including virtually all NATO armies--the United States and Turkey are the only members of NATO who continue to

9

discriminate--allow persons who are openly gay to serve, with no deterioration in morale, unit cohesion, or general military effectiveness. For example, Britain and Israel, two of the most highly-regarded and effective armies in the world, include gay, lesbian and bisexual soldiers without any diminution in cohesion or morale.

22.    The assertion that morale and unit cohesion would suffer in American forces populated by openly gay soldiers is belied by the fact that U.S. troops have repeatedly served alongside and under the command of European military forces that include gay soldiers. In the most recent Iraq war, for example, more than 250,000 American troops served alongside approximately 45,000 troops from the British armed forces and some 2,000 American forces served under British command. Similarly, in Afghanistan, American troops in the 5,000-member International Security Assistance Force serve alongside troops from Europe and Canada, and served, from time to time, under the command of military leaders from Germany and the Netherlands--none of which prohibit gay, lesbian or bisexual soldiers from serving.

23.    The most the DOD can say is that certain members of the military may be prejudiced against gays and lesbians, and the military should defer to their prejudice to promote morale and unit cohesion. Private prejudice, however, can never be an acceptable justification for public discrimination.

24.    Because of its continuing discrimination against gays, lesbians and bisexuals, the U.S. military cannot and does not sign policies prohibiting discrimination in recruiting and employment. Indeed, because of that practice, the military has refused to sign the assurances of non-discrimination which the faculty requires of all employers, public and private, civilian and military.

<u>The DOD's Unlawful Application of the Solomon Amendment to Yale</u>

25.     The Solomon Amendment reads in pertinent part as follows:

"Denial of funds for preventing military recruiting on campus.  No funds described in subsection (d)(2) may be provided by contract or by grant (including a grant of funds to be available for student aid) to an institution of higher education (including any subelement of any such institution) if the Secretary of Defense determines that that institution (or any subelement of that institution) has a policy or practice (regardless of when implemented) that either prohibits, or in effect prevents--

> (1) the Secretary of a military department or Secretary of Transportation from gaining entry to campuses, or access to students (who are 17 years of age or older) on campuses, for purposes of military recruiting; or

> (2) access by military recruiters for purposes of military recruiting to the following information pertaining to students (who are 17 years of age or older) enrolled at that institution (or any subelement of that institution):

>> (A)     Names, addresses, and telephone listings.

>> (B)     Date and place of birth, levels of education, academic majors, and degrees received, and the most recent educational institution enrolled in by the student."

10 U.S.C.§ 983(b).

26.     A DOD regulation provides that the above limitations on funding do not apply to an institution if that institution:

> "[w]hen not providing requested access to campuses or to students on campus, certifies that all employers are similarly excluded from recruiting on the premises of the covered school, or presents evidence that the degree of access by military recruiters is at least equal in quality and scope to that afforded to other employers".

32 C.F.R. § 216.4(c) (3).

27.     Yale University receives over $300 million annually in federal funding for, among other things, biological research, medical research, research related to education, research related to aviation or the national space program, research related to

national defense, and research projects at the Law School, including programs of at least one Faculty Member.

28.     From 1978, when the then members of the faculty first required all employers to provide assurances of non-discrimination on the basis of sexual orientation, until 2002, the DOD was barred from utilizing the facilities of the CDO--a protest against the military's discriminatory practices.  As a result of the DOD's threats to deprive the entire University of certain federal funding unless the Law School provided the DOD with undifferentiated access to the CDO's facilities, the Law School community, including the Faculty Members, was forced to acquiesce to the "temporary" suspension of the Policy in 2002.  Prior to that time, the Law School had offered to provide the military with the following assistance in its efforts to recruit Yale law students:

- open access to classrooms and other meeting spaces on campus for informational sessions and other recruitment activities, including interviews, at the invitation of any student or student organization;

- open privileges to any student or student group to reserve a classroom or other meeting space on campus for such a meeting at any time; and

- open access to student contact information that could be used to instruct students about submitting resumes to a representative of the military.

29.     Starting in 2001, in a reversal of the consistent practice of Defendant Rumsfeld's predecessor Secretaries of Defense, the DOD demanded not only that the military receive access to the Law School's campus, but also that the Faculty Members provide the military with the public association and endorsement necessarily conveyed by allowing the military undifferentiated access to the CDO program.

30.     Although the Law School has explained how its accommodations ensure compliance with the Solomon Amendment, on May 29, 2003, the Office of the Secretary

12

of Defense issued an opinion letter declaring that the Law School and Yale University were in violation of the Solomon Amendment because the Law School (1) did not comply with DOD regulations and (2) "in effect" prevented military recruiting on campus, and declaring its intention to recommend that Yale University's federal funding be denied. The DOD asserted that the exclusion of military recruiters from the CDO programs "*sends the message* that employment in the Armed Forces of the United States is less honorable or desirable than employment with the other organizations that Yale permits to participate in the CDO programs". (Emphasis added.) The DOD is correct that the members of the faculty seek to send a message, but is wrong about the content of that message. The message is that discrimination is immoral.

31.    In his May 29, 2003, letter, William J. Carr, Acting Deputy Under Secretary, relied upon a DOD regulation requiring that "[w]hen not providing requested access to campuses or to students on campus", an institution must "present[] evidence that the degree of access by military recruiters is at least equal in quality and scope to that afforded to other employers". 32 C.F.R. § 216.4(c)(3). To the extent the DOD is interpreting the Solomon Amendment to require "equal access", that interpretation is invalid because it goes beyond the DOD's Congressional authorization in a manner that infringes the Faculty Members' First Amendment rights of association and speech and their Fifth Amendment rights to due process of law. The Solomon Amendment says only that the Law School may not prohibit or effectively prevent the military from obtaining access to its students on campus. The Law School does neither. The Solomon Amendment does not require the Faculty Members to associate themselves with and give

13

implicit approval of the military's continuing discrimination by permitting it undifferentiated access to the facilities of the CDO.

32.    Because of the Defendant's threats, the members of the Law School faculty have been coerced into temporarily suspending the requirement that military recruiters comply with the Law School's required assurances of non-discrimination. Because of the DOD's massive threat of defunding, the Faculty Members are being forced to allow military recruiters to participate in the Law School's official recruiting programs in contravention of the Policy.  As a result, the Faculty Members are unable to give expression to their anti-discrimination principles, and are being coerced by the DOD into implicitly expressing approval of the military's discrimination.

33.    The defunding threat significantly impairs the way in which the individual Faculty Members can teach and otherwise interact with their students; it curtails their academic freedom and forces the Faculty Members to violate their relationships of trust with their students.  The DOD's actions have compelled the reorganization of the Law School's activities in a way that violates the inclusive and protective environment that has been created by the members of the Law School faculty over the last twenty five years.  The Faculty Members and their institutions are being coercively co-opted into a discriminatory enterprise that demeans and insults their students.  Although they teach tolerance in the classroom and in their relations with their students outside the classroom, the Faculty Members' forced participation in discrimination against their gay and lesbian students transforms a message of tolerance into an appearance of hypocrisy.

34.    By threatening to deprive Yale University of $300 million in annual funding unless the members of the faculty acquiesce in giving the military

undifferentiated access to CDO facilities and services, the DOD is infringing the Faculty

Members' rights of free association and speech guaranteed by the First Amendment, and

their Fifth Amendment rights to due process of law. The DOD is infringing the Faculty

Members' right of free association by coercing the Faculty Members to acquiesce to

military participation in integral activities of the Law School. The DOD is infringing the

Faculty Members' right of free speech by securing under duress the implicit approval that

is conveyed by the military's undifferentiated access to CDO facilities and services. The

DOD is infringing the Faculty Members' Fifth Amendment rights to due process of law

by forcing them to participate in the infliction of wrongful discrimination against their

own students. The DOD's attempt to infringe the Faculty Members' rights of free speech

and association is not justified by any legitimate governmental purpose. The only reason

that the Faculty Members would deny military recruiters access to CDO facilities and

services is that the DOD refuses to subscribe to the non-discrimination policy because of

its desire to continue discriminating against gays and lesbians in violation of their rights

to privacy and equal protection guaranteed by the Fifth Amendment.

## CLAIMS FOR RELIEF

### Count I
### THE SOLOMON AMENDMENT VIOLATES THE YALE LAW SCHOOL FACULTY MEMBERS' FREEDOM OF SPEECH AND FREEDOM OF ASSOCIATION GUARANTEED BY THE FIRST AMENDMENT

35.     Plaintiffs repeat and reallege each and every allegation set forth in

paragraphs 1-34 of this Complaint.

36.     The Faculty Members have First Amendment rights not to endorse or

associate with employers who refuse to subscribe to the non-discrimination Policy.

15

37.     The Solomon Amendment places an unconstitutional condition on Yale University's receipt of certain federal grants and contracts by conditioning those grants on the Faculty Members' surrender of their First Amendment rights of Freedom of Speech and Freedom of Association.

38.     The condition is unrelated to the purpose for which the funds are provided.

39.     The magnitude of the threatened funding deprivation makes the condition coercive.

40.     There is no legitimate justification for this infringement of the Faculty Members' First Amendment rights of Freedom of Speech and Freedom of Association.

### Count II
### THE ACTIONS OF DEFENDANT RUMSFELD AND THE DOD IN APPLYING THE SOLOMON AMENDMENT TO THE YALE LAW SCHOOL INFRINGE THE FACULTY MEMBERS' RIGHTS OF FREEDOM OF SPEECH AND FREEDOM OF ASSOCIATION GUARANTEED BY THE FIRST AMENDMENT

41.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-40 of this Complaint.

42.     The Faculty Members have First Amendment rights not to endorse or associate with employers who refuse to subscribe to the non-discrimination Policy.

43.     Defendant Rumsfeld and the DOD have infringed the Faculty Members' First Amendment rights of Freedom of Speech and Freedom of Association by applying the Solomon Amendment to the Law School so as to demand "access . . . equal in quality and scope" to that offered to employers who subscribe to the non-discrimination Policy.

44.     Defendant Rumsfeld and the DOD have applied the Solomon Amendment to the Law School so as to place an unconstitutional condition on Yale University's receipt of certain Federal contracts and grants by conditioning those grants on the Faculty

Members' surrender of their First Amendment rights of Freedom of Speech and Freedom of Association.

45.   The condition is unrelated to the purpose for which the funds are provided.

46.   The magnitude of the threatened funding deprivation is coercive.

47.   There is no legitimate justification for Defendant Rumsfeld's actions in threatening to deprive Yale University of its federal funding.

### Count III
### THE SOLOMON AMENDMENT VIOLATES THE YALE LAW SCHOOL FACULTY MEMBERS' FIFTH AMENDMENT RIGHTS

48.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-47 of this Complaint.

49.   The Solomon Amendment forces the Faculty Members to participate actively in the infliction of wrongful discrimination against their own students, and to violate the students' equal protection and substantive due process rights, thereby violating the special relationship between student and teacher.

50.   The Faculty Members have a Fifth Amendment right to protect the special relationship between student and teacher, and to refuse their active participation in the infliction of wrongful discrimination against their own students.

### Count IV
### THE ACTIONS OF DEFENDANT RUMSFELD AND THE DOD IN APPLYING THE SOLOMON AMENDMENT TO THE YALE LAW SCHOOL VIOLATE THE FACULTY MEMBERS' FIFTH AMENDMENT RIGHTS

51.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-50 of this Complaint.

52.   Defendant Rumsfeld and the DOD force the Faculty Members to participate actively in the infliction of wrongful discrimination against their own students,

17

and to violate the students' equal protection and substantive due process rights, thereby violating the special relationship between student and teacher.

53.     The Faculty Members have a Fifth Amendment right to protect the special relationship between student and teacher, and to refuse their active participation in the infliction of wrongful discrimination against their own students.

**Count V**
**THE ACCOMMODATIONS OFFERED TO MILITARY RECRUITERS BY THE YALE LAW SCHOOL COMPLY WITH THE REQUIREMENTS OF THE SOLOMON AMENDMENT AND DEFENDANT'S ADDITIONAL DEMANDS FOR UNDIFFERENTIATED ACCESS TO THE CAREER DEVELOPMENT OFFICE ARE NEITHER AUTHORIZED BY CONGRESS NOR CONSISTENT WITH THE FIRST AMENDMENT**

54.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-53 of this Complaint.

55.     The Faculty Members have First Amendment rights to refuse to associate with or endorse employers who refuse to subscribe to the non-discrimination Policy, including the right to deny such employers access to the CDO.

56.     The Law School provides military recruiters with all of the information concerning, and access to, its students that is reasonably required for the military to solicit its students for employment.

57.     Military recruiters are neither prohibited nor prevented from obtaining information concerning, or access to, the Law School's students and the Law School is therefore in compliance with the requirements of the Solomon Amendment.

58.     In rejecting the accommodations made by the Law School for military recruiting and in demanding undifferentiated access to the CDO, Defendant Rumsfeld and the DOD have exceeded their Congressional authorization and infringed the Faculty Members' First Amendment rights of Freedom of Association and Freedom of Speech.

18

**WHEREFORE,** Plaintiffs respectfully request that the Court grant the following relief:

(1)    A declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that the Solomon Amendment is null and void on the ground that it imposes conditions on federal funding in violation of the First Amendment's guarantees of Freedom of Speech and Freedom of Association;

(2)    A declaratory judgment pursuant to 28 U.S.C. §§2201, 2202 declaring that the actions of Defendant Rumsfeld and the DOD in applying the Solomon Amendment to the Law School violate the Faculty Members' rights of Freedom of Speech and Freedom of Association as guaranteed by the First Amendment;

(3)    A declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that the Solomon Amendment is null and void on the ground that it violates the Faculty Members' rights to due process under the Fifth Amendment;

(4)    A declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that the Solomon Amendment as applied by Defendant Rumsfeld and the DOD violates the Faculty Members' rights to due process under the Fifth Amendment;

(5)    In the alternative, a declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that the Law School's denial of access to military recruiters to the facilities and services of the CDO and its provision of alternative means of access to Law School students constitutes compliance with the requirements of the Solomon Amendment;

(6)    An order enjoining Defendant Rumsfeld and the DOD from terminating or threatening to terminate any Federal funding to the Law School, Yale University, or any

of its constituent elements, or attempting otherwise to enforce the Solomon Amendment against the University;

(7)     An award of reasonable attorneys fees and costs pursuant to 28 U.S.C. § 2412; and

(8)     Such other and further relief as the Court deems proper.

Plaintiffs,

By _____
          David N. Rosen
          ROSEN & DOLAN, P.C.
          400 Orange Street
          New Haven, CT 06511
          (203) 787-3513
          ct000196

Of Counsel:

Paul M. Dodyk
825 Eighth Avenue
      New York, NY 10019
          (212) 474-1214

Daniel Slifkin
CRAVATH, SWAINE & MOORE LLP
      825 Eighth Avenue
          New York, NY 10019
              (212) 474-1000